IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS W. SPAUDE AND ANGELA M. SPAUDE, INDIVIDUALLY AND AS CO-TRUSTEES OF THE THOMAS W. SPAUDE AND ANGELA M. SPAUDE TRUST DATED JULY 9, 2003, AND DENNIS C. MACIESKI, INDIVIDUALLY AND AS TRUSTEE OF THE MACIESKI CRNA PC 401(K) | ) ) ) ) ) ) ) ) ) | Case No.<br><br>Judge<br><br>Magistrate Judge<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury trial demanded |
| Plaintiffs,<br>v.<br><br>PHILLIPS MURRAH, P.C. and THOMAS WOLFE,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) | |

## INTRODUCTION

1.     This lawsuit is brought by Plaintiffs, Thomas W. Spaude and Angela M. Spaude,

individually and as co-trustees of the Thomas W. Spaude and Angela M. Spaude Trust dated July

9, 2003, and Dennis C. Macieski, individually and as trustee of the Macieski CRNA PC 401(k),

individually and on behalf of all others similarly situated (the "Class"), who allege upon personal

knowledge, investigation by counsel, and upon information and belief from, among other sources

the complaint and evidence filed in *Securities and Exchange Commission v. Harrison Schumacher,*

*et al.*, Civil Action No. 15-6388 (C.D. Cal. Filed Aug. 21, 2015), as follows.

1

2.      Plaintiffs and the Class are investors in the fraudulent Quantum Scheme[1], and bring this lawsuit against the Phillips Murrah, P.C. ("Phillips Murrah") and its employee and principal, attorney Thomas Wolfe (both collectively referred to as the "Phillips Murrah Defendants").

3.      The Quantum Scheme was an Oklahoma-incorporated and headquartered fraudulent investment scheme perpetrated by Quantum Energy LLC, Quaneco, LLC (together, "Quantum") and its principals, Paul Mysyk and Harrison Schumacher, out of Oklahoma, Ohio, and California, between the late 1990s and 2015[2], and raised tens of millions of dollars from more than 300 investors nationwide.

4.      As part of the fraudulent scheme, Quantum and its principals orchestrated a series of offerings, ostensibly to develop oil and gas resources in the western United States. In reality, Quantum and its principals commingled funds from investors and diverted investor money from their stated purpose – oil and gas investments – to their personal use, to prop up the Quantum Scheme, and to invest in other investment opportunities, including another Ponzi scheme.

5.      In August 2015, the Securities and Exchange Commission sued Quantum and its principals for fraud and charged them with perpetrating a fraudulent investment scheme, misappropriating investor money, and causing investors to lose the vast majority of their investments.

6.      Defendant Phillips Murrah, through its attorneys and agents, including Robert O'Bannon, Beverly Vilardofsky, and Defendant Wolfe, played a key role in assisting the Quantum Scheme, by helping structure each of Quantum's securities offerings at issue, advising Quantum

---

[1] The Quantum Scheme consisted of Quantum, as defined herein, together with the various, integrated securities offerings Quantum and its principals orchestrated, as described in this Complaint.
[2] Mysyk withdrew from the scheme in November 2012.

and its principals about how to promote the Quantum Scheme, preparing the offering documents[3] for the Quantum offerings.  Phillips Murrah and its attorneys and agents also assisted the Quantum Scheme by engaging in conduct that went beyond their provision of legal services. This conduct included providing non-legal services, including helping the Quantum Defendants seek critically-needed financing to enable the Quantum Scheme to continue.

7.     Additionally, the Phillips Murrah Defendants acted negligently in the course of their representation of Quantum in connection with several securities offerings that were part of the Quantum Scheme in the oil and gas industry beginning in 2006.

8.     Among other things, Phillips Murrah Defendants ignored serious red flags relating to fraudulent misuse of company funds, drafted offering documents directed to investors that they knew contained material misrepresentations and omissions, failed to disclose Quantum's insolvency, failed to disclose material events of which they had personal knowledge - including allegations of embezzlement of investor funds made by one Quantum principal against another and a lawsuit brought by one Quantum principal against the other - and failed to disclose that Quantum was insolvent and unable to pay its bills, and that the various Quantum programs were fraudulent and had resulted in total losses in five of six different programs.

9.     Additionally, the Phillips Murrah Defendants failed to withdraw from its representation of Quantum even when it became clear that the Quantum Scheme entities were engaged in unlawful and fraudulent conduct.

10.     As a result of the Phillips Murrah Defendants' negligence and assistance of the Quantum Scheme, Plaintiffs lost most or all of their investments in the Quantum Scheme.

---

[3] The terms "offering documents" and "private placement memoranda" are used interchangeably in this Complaint.

## PARTIES

**Plaintiffs**

11.     Plaintiffs are investors in the Quantum Scheme, who purchased investments since July 9, 2003 and each suffered harm as a result of the Scheme.

12.     Thomas W. Spaude and Angela M. Spaude are residents of Saginaw, Michigan. Mr. and Mrs. Spaude, individually and as co-trustees of the Thomas W. Spaude and Angela M. Spaude Trust dated July 9, 2003, invested over $80,000 in various Quantum programs beginning in 2003, including a $20,000 investment in the Rich County Overriding Royalty Offering in November 2008 and a $10,000 investment in the Quantum Energy 2011 Drilling and Production Program in March 2012. Mr. and Mrs. Spaude's purchased their investments directly from Quantum, just like the other putative class members in this matter.

13.     Dennis C. Macieski is a resident of Idaho Fall, Idaho. Mr. Macieski, individually and as trustee of the Macieski CRNA PC 401(k) invested $187,500 in Quaneco, LLC Preferred B Units Offering in December 2007. Additionally, Mr. Macieski and his wife, Mayrene Macieski, invested $10,000 in the Crawford Thrust Offering in July 2010. Mr. and Mrs. Macieski's Quantum investments were also sold to them directly by Quantum, just like the other putative class members in this matter.

**Defendants**

14.     Defendant Phillips Murrah is a law firm located in Oklahoma City, Oklahoma. It currently employs approximately 75 attorneys and represents itself as "Oklahoma's Business Law Firm." Defendant Phillips Murrah employed several attorneys who provided legal and non-legal services to the Quantum Scheme, including Robert O'Bannon and Defendant Wolfe, who are principals of Phillips Murrah at all relevant times; Beverly Vilardofsky, who is currently a

4

principal of Phillips Murrah, and other attorneys who were employed by Phillips Murrah at the time, including Douglas Branch, June Phillips, Dawn Rahme and Carol Barnes.

15.    Defendant Thomas Wolfe is and was at all times relevant hereto an attorney working at Phillips Murrah and is a principal of the firm. He resides and is licensed to practice law in Oklahoma. He is not licensed to practice law in any other states. By virtue of his interactions with Quantum and the Quantum principals and employees, as well as through his communications with his colleagues at Phillips Murrah who also assisted the Quantum Scheme, Defendant Wolfe had knowledge of the inner workings of Quantum and Quaneco and the misconduct alleged herein. Wolfe along with other Phillips Murrah attorneys represented and advised Quantum and its principals in connection with the offerings described below and provided crucial non-legal services to Quantum, such as helping Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

16.    The Phillips Murrah Defendants conducted business mainly in Oklahoma and often directed their activities towards this District because they provided assistance and legal services to, and communicated with, Quantum and Mysyk in this District during the relevant time.

**IMPORTANT NONPARTIES**

17.    Paul Mysyk is a resident of Ohio and co-founder, as well as former 50% owner and principal of Quantum through and including 2012. At all relevant times Mysyk resided in Ohio and presided over Quantum's office in Ohio.

18.    Harrison Schumacher is a resident of California and a co-founder and owner and principal of Quantum. Schumacher manned Quantum's California office.

19.    Quantum Energy LLC is an entity incorporated and domiciled in Oklahoma, that had business offices located in this District, in Oklahoma, and in California. It was formed by

5

Schumacher and Mysyk in 1997. From its inception to November 1, 2012, Schumacher and Mysyk each indirectly owned fifty percent interests in Quantum LLC through ANV, LLC, an entity solely owned by Schumacher, and Sampra, LLC, an entity solely owned by Mysyk. On November 1, 2012, Mysyk transferred his 50% interest in Quantum to Schumacher for $1, and since that date Quantum has been wholly owned by ANV. Since approximately 1997, Quantum has offered and sold a series of oil and gas programs to investors and acted as the agent for those programs. For certain of those programs it receives and distributes royalty payments to investors for producing wells.

20.    Quaneco LLC, incorporated and domiciled in Oklahoma, also had business offices located in this District, in Oklahoma, and in California. It was formed by Schumacher and Mysyk in 1996. Quaneco was wholly owned by Quaneco Energy Holdings, LLC. Quantum listed Quaneco as the operator responsible for hiring drilling contractors and overseeing drilling operations and procuring mineral leases for several of its offerings.

21.    In reality, Quantum Energy LLC and Quaneco LLC are *alter egos* of each other and were run as a single enterprise. They used the same addresses, had the same principals, shared common expenses, including the payment of employee compensation, and commingled funds.

22.    Robert "Bob" O'Bannon is a resident of Edmond, Oklahoma and was at all times relevant hereto an attorney and Director at Phillips Murrah. He represented Quantum, affiliated entities, and its principals, since at least 2006 and was intimately familiar with the operations of the Quantum Scheme and with Mysyk and Schumacher. O'Bannon directly represented and advised Quantum and its principals in connection with the offerings described below. According to Phillips Murrah's website, O'Bannon specializes in, among others, financing transactions for corporate clients through private placement offerings and initial public offerings. O'Bannon also

provided crucial non-legal services to Quantum, such as helping Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

23.     Beverly Vilardofsky is a resident of Oklahoma City, Oklahoma and was at all times relevant hereto an attorney at Phillips Murrah. She participated in drafting the private placement memoranda issued by the Quantum Scheme offerings during the relevant time.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over all counts under the Class Action Fairness Act of 2005 and section 28 U.S.C. 1332, as revised, pursuant to which this Court has diversity jurisdiction because some members of the classes are citizens of States different than Defendants, and because the amount in controversy exceeds the sum or value of $5,000,000.

25.     Venue is proper in this District because many of the illegal acts giving rise to this case occurred in this District, Quantum has an office in this District and did substantial business in the District.  Although the Phillips Murrah Defendants conducted business mainly in Oklahoma, they directed their activities towards this District because they provided assistance and legal services to, and communicated with, Quantum and Mysyk in this District during the relevant time.

## FACTS

### Background – the Quantum Scheme

26.     Quantum and its principals raised tens of millions of dollars from hundreds of investors nationwide through a variety of integrated and fraudulent private placement offerings that ostensibly invested in oil and gas exploration, described more fully below, that were neither registered nor exempt from registration under state and federal law.

27.     Phillips Murrah attorneys drafted the offering documents Quantum sent investors in connection with the offerings.

7

28.    Quantum's fundraising strategy generally followed the following life cycle:

a.    Concoct a new oil or gas "opportunity";

b.    Launch an investment program using offering documents drafted by Phillips Murrah attorneys. Such documents typically omitted the standard "Legal Matters" section, and contained misrepresentations and omissions regarding legal matters facing the company and made material misrepresentations and omissions in the "Use of Proceeds" section and other sections;

c.    Successfully raise the amount of money required for the offering by cold-calling investors, many of whom were unaccredited, given that Quantum did not have a policy of obtaining documentation verifying an investors' accredited investor status;

d.    Deposit the funds raised from investors directly into Quantum's operating account. This practice was in direct contravention to the statements in the offering documents, which represented to investors that the funds would be deposited in a trust account;

e.    Materially violate the offering documents' Use of Proceeds clauses by, among other things, investing the funds raised in related entities, investing investor funds in other investment programs ran by third parties – including another Ponzi scheme, and/or paying excessive and fraudulent operating expenses and compensation;

f.    Eventually lose the entire value of the investments and fail to provide a return or, often, even drill a successful oil or gas well.  This was commonly the result of Quantum and its principals' diversion or fraudulent use of funds, their poor

understanding of the oil and gas industry, selection of poor business partners, and inability to identify and capitalize upon good hydrocarbon fields;

g.  Identify another new oil or gas opportunity, launch a new investment program, and repeat the process, often returning to the same investors with promises of great success on the next project.

29.     Given the misuse and misappropriation of investor funds, and the fact that the Quantum programs were inherently fraudulent and depended upon creating a false picture of Quantum and its operations in order to raise money from investors, the Quantum programs securities would not have been marketable at all but for the fraudulent misrepresentations and omissions in the offering documents.

**Quantum's Private Placement Securities Offerings**

30.     During the relevant times, Quantum and its principals orchestrated a series of private placement securities offerings, all of which purported to raise money from investors for oil and gas exploration.

31.     As to these private placement securities offerings, the Phillips Murrah Defendants provided crucial assistance to Quantum in two ways. First, the Phillips Murrah Defendants helped structure such securities offerings and advised Quantum on how to organize and promote them. Second, the Phillips Murrah Defendants drafted the offering documents for such securities offerings, which offering documents were distributed to investors and used to induce investors to invest in the fraudulent Quantum programs.

32.     As more fully described below, those securities offerings were in reality integrated and part of a scheme to defraud the investors.

***Quaneco, LLC Preferred B Units Offering***

33.     The Quaneco, LLC Preferred B Units Offering, dated October 5, 2005, and November 27, 2006, offered $19,700,000.00 of Preferred B Interests to investors in order to raise capital to develop and drill oil and/or gas wells on approximately 560,000 leased acres in Wyoming, Montana, and Utah.

34.     Investors who purchased the Preferred B Interests were to receive preferred 7 percent distributions on their investments plus 0.3729 percent to 12 percent of subsequent distributions depending on the total number of Preferred B Interests sold.

35.     Upon information and belief, the Phillips Murrah Defendants helped structure the Quaneco, LLC Preferred B Units offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Quaneco, LLC Preferred B Units offering were drafted by the Phillips Murrah Defendants.

36.     The Quaneco, LLC Preferred B Units offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

37.     The investors in the Quaneco, LLC Preferred B Units Offering ultimately suffered substantial losses as a result of their investments.

***Rich County Overriding Royalty Offering***

38.     In the Rich County Overriding Royalty Offering, dated November 1, 2007, Quantum offered a maximum of $5,402,500.00 of overriding royalty interests oil and gas properties in Utah to investors. The offering's ostensive objective was to provide cash distributions to investors from the sale of oil and gas production from new wells to be drilled on the properties and/or the sale of working interests to an incoming partner

39.     Quantum was to use the proceeds of the offering, less its management and administrative fees, to lease approximately 67,000 acres of coal bed methane properties in Rich County, Utah. It was to retain the working interests in the properties and issue each investor a proportionate share of a 2 percent overriding royalty interest in the acreage.

40.     Upon information and belief, the Phillips Murrah Defendants helped structure the Rich County Overriding Royalty offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Rich County Overriding Royalty offering were drafted by the Phillips Murrah Defendants. The Rich County Overriding Royalty offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

41.     The investors in the Rich County Overriding Royalty Offering ultimately suffered substantial losses as a result of their investments.

***Quaneco, LLC Preferred D Units Offering***

42.     In the Quaneco, LLC Preferred D Units Offering, dated December 15, 2008, Quaneco offered $8,490,071.00 of Preferred D Interests in in order to raise capital to develop and drill oil and/or gas wells on approximately 463,000 leased acres in Montana and Utah.

43.     Investors who purchased the Preferred D Interests were to receive preferred 7 percent distributions on their investments plus 0.24365 percent to 12 percent of subsequent distributions depending on the total number of Preferred D Interests sold.

44.     Upon information and belief, the Phillips Murrah Defendants helped structure the Quaneco, LLC Preferred D Units offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Quaneco, LLC Preferred D Units offering were drafted by the Phillips Murrah Defendants.

11

45.     The Quaneco, LLC Preferred D Units offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

46.     The investors in the Quaneco, LLC Preferred D Units Offering ultimately suffered substantial losses as a result of their investments.

### Overthrust Overriding Royalty Offering

47.     In the Overthrust Overriding Royalty Offering, dated February 16, 2009, Quantum offered a maximum of $4,200,000.00 of overriding royalty interests oil and gas properties in Utah to investors.  The offering's primary objective was to provide cash distributions to investors from the sale of oil and gas production from new wells to be drilled on the properties and/or the sale of working interests to an incoming partner.

48.     Quantum was to use the proceeds of the offering, less its management and administrative fees, to lease approximately 67,000 acres of coal bed methane properties in Rich, Summit, and Morgan Counties, Utah.  It was to retain the working interests in the properties and issue each investor a proportionate share of a 1.3258 percent overriding royalty interest in the acreage.

49.     Upon information and belief, the Phillips Murrah Defendants helped structure the Overthrust Overriding Royalty offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Overthrust Overriding Royalty offering were drafted by the Phillips Murrah Defendants.

50.     The offering documents for the Overthrust Overriding Royalty Offering stated that neither Schumacher nor Mysyk received an annual salary in excess of $150,000 and did not contain a "Legal Matters" section.

12

51.     The Overthrust Overriding Royalty offering was fraudulent and its offering documents contained material misrepresentations and omissions, as more fully described below.

52.     The investors in the Overthrust Overriding Royalty Offering ultimately suffered substantial losses as a result of their investments.

***Crawford Thrust Offering***

53.     In the Crawford Thrust Offering, dated April 15, 2010, Quantum offered a maximum of $6,367,552.28 of overriding royalty interests oil and gas properties in Utah and Wyoming to investors. It ultimately raised approximately $4,111,500.00 from 69 investors in more than a dozen states.

54.     Quantum was to use half of the proceeds of the offering, less half its management and administrative fees, to lease approximately 60,000 acres of oil and gas properties Utah and Wyoming.

55.     Specifically, Quantum was to use a portion of the first half of the proceeds to lease approximately 25,000 acres of oil and gas properties in Rich, Summit, and Morgan Counties, Utah adjacent to acreage it had previously leased using proceeds from two prior offerings. It was to retain the working interests in the properties and, subject to approval of the prior investors, communitize the leases and issue investors a proportionate share of a 2 percent blended overriding royalty interest over the total acreage.  In the event the prior investors did not approve the communitization, it was to issue each new investor a proportionate share of the 2 percent overriding royalty interest in the 25,000 acres.

56.     Quantum was to use the remaining portion of the first half of the proceeds to lease approximately 35,000 acres of oil and gas properties in Lincoln and Uinta Counties, Wyoming.  It

was to retain the working interests in the properties and issue each investor a proportionate share of a 2 percent overriding royalty interest in the acreage.

57.     Quantum was to use the second half of the proceeds, less half its management fee, to purchase Quaneco Preferred F Interests.

58.     Upon information and belief, the Phillips Murrah Defendants helped structure the Crawford Trust offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Crawford Trust offering were drafted by the Phillips Murrah Defendants.

59.     The Crawford Thrust offering documents did not disclose, among others, any lawsuits of any sort against Quantum.

60.     The Crawford Trust offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

61.     The investors in the Crawford Thrust Offering ultimately suffered substantial losses as a result of their investment.

***Crane 16-4***

62.     In the Crane 16-4 offering, dated March 1, 2012, Quantum offered investors participation as working interest owners in its proposed Bear River Crane 16-4 well in Rich County, Utah. It ultimately raised approximately $1,560,000.00 from 52 investors in more than a dozen states.

63.     As an incentive, Quantum also proposed to assign investors certain shares of Quaneco stock plus a percentage of the overriding royalty interest in approximately 93,000 acres in Utah and Wyoming, and gave them the option to acquire certain offsets related to the project.

64.     Upon information and belief, the Phillips Murrah Defendants helped structure the Crane 16-4 offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Crane 16-4 offering were drafted by the Phillips Murrah Defendants.

65.     The Crane 16-4 offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

66.     The investors in the Crane 16-4 offering ultimately suffered substantial losses as a result of their investments.

***Quantum 2012 Overriding Royalty and Development Program***

67.     In the Quantum 2012 Overriding Royalty and Development Program, dated October 22, 2012, Quantum offered a maximum of $9,342,857.14 of overriding royalty interests oil and gas properties in the Rocky Mountain region to investors. The offering's primary stated objective was to provide cash distributions to investors from the sale of oil and gas production from new wells to be drilled on the properties and/or the sale of working interests to an incoming partner.

68.     Quantum was to use the proceeds of the offering, less its management and administrative fees, to lease approximately 100,000 acres of oil and gas properties in the Rocky Mountain region. It was to retain the working interests in the properties and issue each investor a proportionate share of a 2 percent overriding royalty interest in the acreage.

69.     Upon information and belief, the Phillips Murrah Defendants helped structure the Quantum 2012 Overriding Royalty and Development offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Quantum 2012 Overriding Royalty and Development offering were drafted by the Phillips Murrah Defendants.

15

70.    The Quantum 2012 Overriding Royalty and Development Program offering documents stated that proceeds would be deposited in a trust account and did not contain a "Legal Matters" section.

71.    The Quantum 2012 Overriding Royalty and Development offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

72.    The investors in the Quantum 2012 Overriding Royalty and Development Program ultimately suffered substantial losses as a result of their investments.

***Quantum 2011 Drilling and Production Program***

73.    In the Quantum Energy 2011 Drilling and Production Program, dated February 1, 2011, Quantum offered a maximum of $6,000,000 in units of oil and gas interests to be used to acquire then-unknown working interests in the continental United States.

74.    Upon information and belief, the Phillips Murrah Defendants helped structure the Quantum Energy 2011 Drilling and Production offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Quantum Energy 2011 Drilling and Production offering were drafted by the Phillips Murrah Defendants.

75.    The Quantum 2011 Drilling and Production Program offering documents contained no "Legal Matters" section and stated that neither of the managers would receive salary, distributions and bonuses in excess of $150,000.

76.    The Quantum 2011 Drilling and Production Program offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

16

77.     The investors in the 2011 Drilling and Production Program ultimately suffered substantial losses as a result of their investments.

*Quantum Energy Phoenix Program*

78.     In the Quantum Energy Phoenix Program, dated March 2, 2015, Quantum offered a maximum of $750,000.00 of overriding royalty interests oil and gas properties in Utah and Wyoming to investors. The offering's primary objective was to provide cash distributions to investors from the sale of oil and gas production from new wells to be drilled on the properties and/or the sale of working interests to an incoming partner.

79.     Quantum was to use the proceeds of the offering, less its management and administrative fees, to lease approximately 67,000 acres of oil and gas properties in Rich, Summit, and Morgan Counties, Utah and Lincoln and Uinta Counties, Wyoming. It was to retain the working interests in the properties and issue each investor a proportionate share of a 3.5 percent overriding royalty interest in the acreage as well as a 12.5 percent equity interest in the company.

80.     Upon information and belief, the Phillips Murrah Defendants helped structure the Quantum Energy Phoenix Program offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Quantum Energy Phoenix offering were drafted by the Phillips Murrah Defendants.

81.     The Quantum Energy Phoenix Program offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

82.     The investors in the Quantum Energy Phoenix Program ultimately lost a significant portion of their investments.

17

*Niabora Leasing and Development Program*

83.    In the Niabora Leasing and Development Program, dated January 8, 2014, Quantum offered a maximum of $2,500,000.00 of working interests in oil and gas properties to investors.  The offering's primary objection was to provide cash distributions to investors from the sale of oil and gas production from wells to be drilled on the properties and/or the sale of working interests to an industry peer.

84.    Quantum was to use the proceeds of the offering, less its management and administrative fees, to acquire leases in oil and gas properties in the Rocky Mountain region and to participate in the exploration for and development and production of oil and gas through the drilling of new wells.   Investors were to receive a proportionate share of a 25 percent working interest in each well drilled on the acreage acquired by the offering.

85.    Upon information and belief, the Phillips Murrah Defendants helped structure the Niabora Leasing and Development Program offering and advised Quantum on how to organize and promote such offering. Additionally, the offering documents for the Niabora Leasing and Development Program offering were drafted by the Phillips Murrah Defendants.

86.    The Niabora Leasing and Development Program offering was fraudulent, and its offering documents contained material misrepresentations and omissions, as more fully described below.

87.    The investors in the Niabora Leasing and Development Program ultimately lost a significant portion of their investments.

**The Quantum Scheme's Sales of Securities to Plaintiffs**

88.    Quantum directly sold securities to Plaintiffs and members of the putative class.

18

89.     Mr. and Mrs. Spaude purchased a $20,000 investment in the Rich County Overriding Royalty Offering directly from Quantum in November 2008. They also purchased a $10,000 investment in the Quantum Energy 2011 Drilling and Production Program directly from Quantum in March 2012.

90.     Mr. Macieski purchased a $187,5000 investment in Quaneco, LLC Preferred B Units Offering in December 2007 directly from Quantum. Additionally, Mr. Macieski and his wife, Mayrene Macieski, purchased a $10,000 investment in the Crawford Thrust Offering directly from Quantum in July 2010.

91.     Dennis C. Macieski is a resident of Idaho Fall, Idaho. Mr. Macieski, individually and as trustee of the Macieski CRNA PC 401(k) invested $187,500 in Quaneco, LLC Preferred B Units Offering in December 2007. Additionally, Mr. Macieski and his wife, Mayrene Macieski, invested $10,000 in the Crawford Thrust Offering in July 2010. Mr. and Mrs. Macieski's Quantum investments were sold to them directly by Quantum.

**Integration of Offerings**

92.     In reality, the Quantum Scheme's securities offerings described above were integrated, and part of a single, unitary and fraudulent scheme to defraud investors.

93.     All Quantum Scheme's securities offerings raised money ostensibly to invest in oil and gas exploration opportunities.

94.     Quantum and all Quantum Scheme programs were managed and overseen by the same individuals, from the same offices, used the same corporate resources belonging to Quantum, and employed the same employees.

95.     All Quantum Scheme programs raised money from the same types of investors, and often from the same investors nationwide.

19

96.     All Quantum Scheme programs commingled money from investors and misused that money, without investors' consent.

97.     All Quantum Scheme programs represented to investors that the funds raised in connection with the offerings described above would be deposited in separate trust accounts.

98.     Upon investigation, information and belief, Quantum never created these trust accounts. Instead, they simply deposited all funds raised from investors directly into Quantum's operating account.

99.     All Quantum Scheme programs defrauded investors through similar misrepresentations and omissions.

100.    As a result of this commingling of funds each investor essentially invested in the Quantum Scheme itself, and not in a specific Quantum program, such that each and every Quantum Scheme investor is similarly situated in all material respects to all other Quantum Scheme investors, and all are creditors of the Quantum Scheme.

**Lawyers' Obligations in Connection with Securities Offerings**

101.    Lawyers play a vital role in advising issuers, especially inexperienced issuers, in connection with securities offering.

102.    Lawyers typically assist issuers by, among other things, preparing disclosure documents including registration statements and private placement memorandums to be relied upon by potential investors in connection with the offering.

103.    Under the federal and state regulatory schemes, such disclosure documents are prepared for the benefit of the investors in such securities offerings.

20

104.    The complexities of the securities laws have resulted in extensive utilization of lawyers by issuers and others seeking to comply with these laws, for the protection of the investing public.

105.    The type and extent of work performed by the lawyer varies with the size of the transaction, any time limitations involved, and any fee restraints imposed.  The lawyer's relationship with the client will also vary depending on whether he or she has been newly-engaged by the client or has a long-standing relationship with the client, and whether he or she has been advising the client regularly or infrequently.

106.    Of course, a lawyer should not render a legal opinion or other legal advice, or draft legal documents for the benefit of unsuspecting third parties, based on factual information or material which he or she knows or suspects to be inaccurate in any material respect.

107.    A lawyer typically has no obligation to verify statements made or other information provided to him or her by the client unless he or she is of aware of inconsistent information or circumstances which reasonable alert him or her that such statements or information may be erroneous or incomplete in a material respect.

108.    Where a lawyer is aware of such inconsistencies or circumstances, the doubts which they create should be resolved to the lawyer's satisfaction through further inquiry or other appropriate investigation.

109.    A lawyer's assistance in preparing offering documents for securities offerings often includes reviewing and analyzing issues concerning titles, important contracts, pending litigation, and impact of laws having a special effect on the issuer.

110.    A lawyer should further assist the issuer in deciding what information should be included in the offering documents for a securities offering, how it should be included, and to what extent its omission would raise questions under the securities laws.

111.    The lawyer should advise the issuer when he or she believes that the offering documents for a new securities offering, as then proposed or filed, may be misleading.  In such circumstances, if the lawyer is not satisfied after pursuing the matter with the issuer, it may be appropriate for him or her to take other action such as informing the client's board of directors or resigning.

**The Phillips Murrah Defendants' Wrongdoing**

112.    Phillips Murrah served as Quantum's corporate attorneys beginning in approximately 1997.

113.    The Phillips Murrah Defendants engaged in wrongdoing in three separate ways: first, the Phillips Murrah attorneys  helped Quantum structure the Quantum securities offerings, and assisted them and advised them as to the organization and promotion of such securities offerings.; second, the Phillips Murrah attorneys drafted all the offering documents Quantum sent investors in connection with its various offerings at issue in this case; and third, the Phillips Murrah attorneys provided non-legal services to Quantum, such as helping Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

*The Phillips Murrah Defendants' Advice Regarding the Quantum Securities Offerings and Investor Accreditation*

114.    Phillips Murrah attorneys including Carol Barnes[4],Robert O'Bannon, Vilardofsky, and Defendant Wolfe helped Quantum structure its securities offering and advised Quantum and its principals regarding their compliance with the securities laws and regulations.

115.    The Phillips Murrah attorneys also advised Quantum on how to organize and promote securities offerings to investors.

116.    Among other things, the Phillips Murrah attorneys advised Quantum and its principals regarding the process for certifying accredited investors.  The Phillips Murrah attorneys were aware of and apparently blessed Quantum's practice of not obtaining any third party documentation such as investment account statements or other information from investors in connection with verifying their accredited investor status.

117.    Quantum was audited by the State of Ohio in approximately 2008. O'Bannon attended the audit and assured Quantum and its principals that with respect to their process for certifying accredited investors they were "doing things the right way."

118.    Upon investigation and information and belief, Quantum was not doing things the right way. Quantum regularly "cold-called" investors using lists purchased from third parties and did not have internal policies designed to achieve compliance with applicable securities laws and regulations regarding investor accreditation.

119.    For reasons including but not limited to the facts that its offerings were integrated, as more fully described above, were based on materially false representations and omissions, and did not accredit investors properly, Quantum's programs were conducted in violation of applicable

---

[4] Carol Barnes deceased years ago and is not a defendant in this case.

23

securities laws and regulations, and were neither registered nor exempt from registration with the Securities and Exchange Commission.

***The Phillips Murrah Defendants' Knowledge of and Failure to Disclose Pertinent Litigation Involving Quantum***

**Couch Oil Lawsuit**

120.    In 2008, Quantum and certain Quantum-related programs including Quantum 2004 Production Program filed a lawsuit against Charles Couch, Couch Oil & Gas, Robert Couch, and Couch Oil & Gas, Inc. in Dallas County, Texas (Cause No. DC-08-09597, in the 192nd Judicial District) in connection with the Quantum plaintiffs' investments in various Couch Oil programs.

121.    Couch Oil was a fraudulent investment scheme that purported to invest investor money in oil and gas opportunities. It and its principal, Charles Couch, were sued by the Securities and Exchange Commission in May 2014 for perpetrating a Ponzi scheme that stole millions of dollars from investors nationwide. A final judgment against them was entered in the U.S. District Court for the Northern District of Texas on May 9, 2016.

122.    In their case against Couch Oil, the Quantum plaintiffs made a number of startling claims against the Couch Oil defendants, including for securities fraud, deceptive trade practice, violations of Oklahoma and Texas securities laws, fraud, fraudulent inducement, veil piercing/alter ego liability, conversion, violations of the Texas Theft Liability Act, and breach of fiduciary duty.

123.    In the course of their original petition and five amended petitions, the Quantum plaintiffs alleged, among other things:

        a.    That Charles Couch represented that Couch Oil had oil and gas interests worth more than $8 billion and that the investment carried "minimal to no risk," while in fact Couch Oil did not have such interests, had only one bookkeeper, used Quickbooks

and Excel to run the business, and operated out of a "Dallas Research Center" that was actually "free space that he used because it was on the second floor of a floor mat company he owned in a rough section of Irving;"

   b. That Couch Oil did not disclose to Quantum that Charles Couch had previously been sued in Pennsylvania for selling unregistered, nonexempt securities in violation of the Pennsylvania securities laws;

   c. That Couch Oil never disclosed the amount of Charles or Robert Couch's compensation or whether they were paid from investment proceeds.  According to Quantum, "This conflict of interest was never disclosed to [Quantum] all in contravention of securities laws mandates of disclosure of material information which was an important factor in determining whether Robert and Charles Couch had a vested interest in selling these programs to pay themselves or whether the deals had too many management fees built into them;"

124.    In sum, Quantum's allegations in the Couch Oil lawsuit made clear that Quantum and its principals were using Quantum investors' money to invest in other oil companies instead of investing it in Quantum's own operations, and it either knew of Couch Oil's alleged misrepresentations and invested anyway or failed to do basic due diligence when deciding to invest.

125.    Mysyk and Schumacher both gave deposition testimony in the course of the Couch Oil case. Mysyk subsequently provided an affidavit in which he states that when he attempted to gain access to Couch Oil's books in 2006, Couch Oil refused by email from its counsel "on or about October 13, 2006, to Robert O'Bannon, Plaintiff's counsel at that time."

126.    This contentious litigation continued until September 26, 2011, when in spite of all the Quantum plaintiffs' allegations the court entered judgment in favor of the Couch Oil defendants and ordered the Quantum plaintiffs to pay $400,000 in legal fees.

127.    The Couch Oil lawsuit, including the claims and allegations made and the ultimate result, were material to investors deciding whether to invest in Quantum. The following facts in particular were material:

a.  That Quantum invested its investors' funds in Couch Oil, instead of employing those funds in its own operations as the investors had been assured;

b.  That Quantum failed to conduct adequate due diligence prior to investing in Couch Oil;

c.  That Quantum was denied access to Couch Oil's books and records;

d.  That Quantum sued a company with which it went into business for securities violations and fraud;

e.  That Quantum was ordered to pay $400,000 in attorney fees;

f.  That Quantum engaged counsel to prosecute the lawsuit, presumably at some expense to the company.

128.    Phillips Murrah and its attorneys knew or should have known of the existence, substance, and result of the Couch Oil lawsuit.  O'Bannon in particular was on notice of the Couch Oil dispute by virtue of Couch Oil's counsel's October 13, 2006 letter.

129.    Wolfe and O'Bannon traveled to Dallas, Texas on at least one occasion, in 2006, to meet with Couch Oil's counsel regarding the dispute.

130.    Phillips Murrah failed to disclose the substance of the Couch Oil lawsuit in the Quantum and Quaneco private placement memorandums it drafted.

26

131.     This information was material because a reasonable investor would have wanted to know such facts in making his or her investment decision.

**Montana Lawsuits**

132.     Quantum's litigation was not limited to Texas. In July 2009, Pinnacle Gas Resources, Inc., a party with which Quantum was doing business, sued Quaneco and several of its programs and subsidiaries in Big Horn County, Montana in July 2009 (Case No. DV 09-35, in the 22nd Judicial District Court).

133.     In that case, Pinnacle sought a declaratory judgment that, under its contract with Quaneco, it was entitled to be declared the operator of the subject project area and that Big Sky breached the operating agreement and various contractual notice provisions. Pinnacle also asked for its attorney fees in connection with Big Sky and Quaneco's alleged breaches.

134.     Pinnacle also sued to foreclose upon two Quantum subsidiaries' interest in the subject land, based on their failure to pay $358,014.54 and $1,834.59, respectively, for operating costs.

135.     Pinnacle further alleged tortious interference with business relations, slander of title, and breach of the covenants of good faith and fair dealing under Montana law.

136.     Prior to the lawsuit, Quantum had demanded Pinnacle provide an accounting and assurances of further solvency, alleged that Pinnacle had failed to act as a reasonably prudent operator, and alleged that Pinnacle had violated Montana's duty of good faith and fair dealing.

137.     On or about August 19, 2009, Quantum requested Phillips Murrah draft a supplement to the private placement memorandum dated March 1, 2009 for persons who purchased royalty interests including in Quantum's Overthrust Overriding Royalty Offering.

138.     The August 19, 2009 update failed to include any information regarding Pinnacle's alleged default or the ongoing litigation in Montana involving Pinnacle. The update did not even include a boilerplate "Legal Matters" section commonly included in private placement memorandums.

139.     While one subsequent Quantum program disclosed the Montana lawsuit – confirming the Phillips Murrah Defendants understood such lawsuit to be material to the investors' decision to invest – the other programs failed to mention it.

140.     Thereafter, on or about November 22, 2010, an attorney representing Royal Bank of Scotland wrote a letter to Quantum informing it that Pinnacle had defaulted on a loan from RBS and that Quantum should make payments owed to Pinnacle directly to RBS.

141.     The Montana litigation involving Pinnacle was material to investors deciding whether to invest in Quantum programs. The following facts in particular were material:

a.   That Quantum was involved in litigation with a company with which they went into business;

b.   That Pinnacle alleged Quaneco failed to pay significant operating costs related to the project;

c.   That Quantum had serious questions regarding Pinnacle's solvency, and that Pinnacle eventually defaulted on a loan obligation to RBS.

142.     Phillips Murrah and its attorneys knew or should have known of the existence, substance, and result of the Montana litigation involving Pinnacle.

143.     Phillips Murrah failed to disclose the substance of the Pinnacle litigation in the Quantum offering documents it drafted.

144.    Like the information regarding the Couch Oil dispute, this information was material because a reasonable investor would want to know these facts in making his or her investment decision.

**The Phillips Murrah Defendants' Knowledge of and Failure to Disclose Diversion of Investor Funds to the Couch Ponzi Scheme.**

145.    As discussed above, by October 2006 the Phillips Murrah Defendants became aware that Quantum had diverted to another, entirely unrelated business, Couch Oil and Gas, money that investors had intended to invest in Quantum programs' operations. Specifically, O'Bannon became aware of this by no later than October 13, 2006, when he received a letter from Couch Oil's counsel discussing the Couch Oil dispute.  Wolfe was likewise aware of the Couch Oil dispute, given that he traveled with O'Bannon to Texas to meet with Couch Oil's attorneys regarding the matter.

146.    The Phillips Murrah Defendants were aware that prospective investors in Quantum programs understood and expected, based on such programs' offering documents drafted by Phillips Murrah itself, that their money would be invested in oil and gas programs managed and overseen by Quantum and its principals.

147.    Indeed, the Quantum programs' offering documents instructed prospective investors that they would have to pay an "overhead" fee of as high as 37.5% for Quantum's overhead to manage the Quantum programs in which the investors were supposed to invest, and touted the skills of Quantum's managers and principals who were going to oversee the operations of such Quantum programs and manage the investors' money invested in those programs.

148.    In reality, as the Phillips Murrah Defendants learned by no later than October 13, 2006, Quantum and its principals, instead of investing their investors' money in Quantum's own

operations and earning the 30% overhead fees by managing those operations, simply transferred part of investor money to another, entirely unrelated supposed oil and gas business, Couch Oil.

149.   As discussed above, Couch Oil was a Ponzi scheme and a scam that was shut down in 2014 by the Securities and Exchange Commission.

150.   As the Phillips Murrah attorneys well knew, it was material to a prospective Quantum investor to know that the money he or she purported to invest in a Quantum program was instead sent to another, unrelated entity, of which the investor knew nothing, to be managed by individuals of which the investors knew nothing.

151.   As the Phillips Murrah attorneys well knew, it was also material to a prospective Quantum investor to know that the substantial, 30% overhead fee was unjustified and unearned since the Quantum principals were simply transferring investors' investments to another, unrelated program, rather than employing such investments for the Quantum programs' own operations.

152.   Thus, the Phillips Murrah attorneys learned, by no later than October 2006 that Quantum and its principals were defrauding their investors by not disclosing to them that their investments were misdirected to an unrelated program.

153.   It would have been material to a prospective Quantum investor in subsequent Quantum programs to know that Quantum and its principals had defrauded investors in earlier Quantum programs and had misused and misdirected their investment proceeds.

154.   The Phillips Murrah attorneys did not include, in any of the offering documents they drafted for subsequent Quantum programs offered to investors during the relevant period, any disclosures about Quantum and its principals defrauding their earlier investors and misusing and misdirecting such investors' investment proceeds.

***The Phillips Murrah Defendants' Knowledge of and Failure to Disclose Harrison Schumacher's Fraudulent Activities***

155.    The "Use of Proceeds" section of any private placement memorandum is a critically important section because it limits how the issuer may use investors' funds.

156.    Phillips Murrah attorneys drafted each of Quantum's private placement memoranda including the Use of Proceeds sections.

157.    The private placement memoranda's Use of Proceeds sections generally required investor funds to be placed in a trust account until spent in connection with the entity's operations. They also generally allowed no more than 30 percent of investor proceeds to be spent on overhead, leaving only 70 percent of investor funds available for actual investment. They also generally limited Harrison Schumacher's annual compensation to no more than $150,000.

158.    Upon investigation and information and belief, no trust accounts were ever opened and Schumacher's annual compensation regularly and significantly exceeded $150,000.

159.    Sometime prior to September 2010, Mysyk learned that Schumacher was engaged in various unlawful and fraudulent activities regarding the funds Quantum raised from investors. Among other things, Mysyk learned Schumacher was (i) taking compensation and bonuses in excess of what was disclosed to investors, (ii) paying operating expenses in excess of what was disclosed to investors, (iii) commingling funds that were to be segregated in trust accounts, and (iv) making loans to himself and affiliated entities out of funds raised from investors.

160.    Specifically:

  a. In connection with the Crawford Thrust Offering, Quantum disclosed it would receive an organizational fee of $50,000.00 and a management fee of 30 percent of

the total amount raised.  At Schumacher's direction, Quantum ultimately spent approximately 39 percent of the funds it raised on overhead including salaries.

b.  Quantum represented to investors that Schumacher's annual compensation would not exceed $150,000.00.  Schumacher in fact paid himself $315,793.50 in 2010 and $153,772.00 in 2011.

c.  Schumacher used Quantum's corporate credit card and other accounts to pay various personal expenses.  He also took various direct loans and advances which he failed to repay.

d.  Schumacher used funds raised in connection with Quantum's Crawford Thrust Offering to make loans and advances to affiliated entities without informing investors.

e.  Quantum never created separate escrow accounts for the funds raised in connection with the Crawford Thrust Offering. Instead, at Schumacher's direction it deposited investor funds directly into its existing operating accounts which it used to, among other things, pay overhead and other expenses.

f.  Similarly, in connection with the Crane 16-4 offering, Quantum represented it would use 100 percent of the funds it raised for drilling and lease expenses for the Crane 16-4 well. At Schumacher's direction, Quantum used only about 40 percent of the funds raised for the well and transferred the remaining funds to Quaneco pursuant to a turnkey drilling agreement. Quaneco paid third parties to complete the well and kept the remaining funds, approximately 29 percent of the total amount raised, to pay its overhead costs.

161.    In September 2010, Mysyk notified O'Bannon orally and in writing of Schumacher's fraudulent financial activities. O'Bannon's response was: "Tell [Schumacher] to stop doing it."

162.    The fact that Schumacher was making undisclosed loans to himself and was drawing more compensation from the company than was permitted under the offering documents was material, as a reasonable investor would want to know these facts in making his or her investment decision.

163.    O'Bannon and the other Phillips Murrah attorneys knew but never disclosed these facts to investors in any way or included this information in the private placement memoranda for Quantum investors.

***The Phillips Murrah Defendants' Knowledge of and Failure to Disclose Harrison Schumacher's Lawsuit Against Paul Mysyk***

164.    In or around September 2010, Mysyk and Schumacher became engaged in a dispute regarding a potential natural gas development in Utah.

165.    O'Bannon arranged for Mysyk and Schumacher to meet at his office to discuss and attempt to resolve the matter.

166.    At the meeting, with Defendant Wolfe and O'Bannon present, Schumacher served Mysyk with a lawsuit he had filed against him in California state court alleging embezzlement of investor funds, fraud, and breach of fiduciary duty.

167.    Thereafter, Mysyk discussed with both O'Bannon and Vilardofsky whether they needed to draft a supplement to the Crawford Thrust private placement memorandum disclosing the lawsuit.

168.    An amendment to the Crawford Thrust private placement memorandum disclosing the lawsuit was apparently tentatively prepared but, upon information and belief, was never sent to investors.

169.    Upon information and belief, investors were never told about Schumacher's lawsuit against Mysyk.

170.    All the while, Quantum and Quaneco continued to raise money from investors.

171.    While Schumacher and Mysyk subsequently – and temporarily – resolved their differences and Schumacher claimed that the lawsuit was the result of a misunderstanding, the fact that one principal of Quantum was rushing to court to sue the other principal for embezzling investor funds rather than discuss with him and clear such "misunderstanding" was a material fact to a reasonable investor, because it was indicative of dysfunctional management at Quantum and the collapse of the working relationship between the two fiduciaries to whom the investors were entrusting their money.

172.    Indeed, the business relationship between Mysyk and Schumacher continued to deteriorate despite a short-lived détente and they ended up parting ways.

173.    Phillips Murrah ostensibly represented Quantum, and not Mysyk and Schumacher. However, when Mysyk and Schumacher eventually parted ways in late 2012, O'Bannon drafted the purchase and assignment agreement whereby Mysyk sold his interest in Quantum to Schumacher for $1.00.

***The Securities and Exchange Commission's Lawsuit Against Quantum, Quaneco, and Schumacher for Fraud***

174.    On August 21, 2015, the Securities and Exchange Commission filed a lawsuit against Schumacher, Mysyk, Quaneco, LLC, and Quantum Energy, LLC in the Central District of

34

California (Case No. CV-15-6388). The suit also named Quantum subsidiaries and/or affiliates Quaneco Energy Holdings, LLC, Fat Chance Oil & Gas, LLC, ANV, LLC as relief defendants. Schumacher's wife, Tara Schumacher, was also named as a relief defendant.

175. On or about December 24, 2015, the SEC filed an amended complaint that expanded the allegations against Quantum.

176. Broadly, the SEC's lawsuit alleges Quantum and Schumacher made material misrepresentations in offering documents and violated securities laws and the terms of the offering documents by, among other things:

    a. Exceeding the permissible amounts of compensation paid to Schumacher;

    b. Making affiliate loans forbidden by the documents;

    c. Using turnkey contracts to conceal diversion of investor funds;

    d. Using investor funds to pay bonuses to salespersons;

    e. Depositing investor funds into Quantum's operating account instead of into an escrow account as required by certain offering documents, and when no escrow account had been established;

    f. Raising money from investors, ostensibly for drilling a specific tract of land, after having concluded there was no chance of recovering oil on the lands for which the money was being raised;

177. The SEC obtained deposition testimony from Mysyk, Schumacher, and others prior to filing its lawsuit.

178. Mr. O'Bannon defended Mysyk in his deposition with the SEC on February 25 and 26, 2015. It was during that deposition that Mysyk testified about communicating with Mr.

O'Bannon, orally and in writing about Schumacher's fraudulent financial activities, and about Mr.

O'Bannon's instructions for Mysyk to "[t]ell [Schumacher] to stop doing it."

179.    Mr. O'Bannon also defended Schumacher at his deposition with the SEC on

February 23 and 24, 2015.

***The Phillips Murrah Defendants Also Provided Non-Legal Services to Quantum by Assisting Quantum in Obtaining Financing***

180.    The Phillips Murrah attorneys, acted beyond the role of legal counsel, and assisted

Quantum in seeking outside financing.

181.    Aware of Quantum's debilitating financial problems, Phillips Murrah through its

principals, including Defendant Wolfe, assisted Quantum in efforts to obtain financing.

182.    The Phillips Murrah Defendants sought lenders and investors, such as banks, other

oil companies, and foreign investors in efforts to assist Quantum to obtain financing.

183.    The Phillips Murrah Defendants' efforts to obtain financing included interacting

with lenders and investors on Quantum's behalf.

***The Phillips Murrah Defendants Knowingly Assisted the Failing Quantum Programs***

184.    Although the Phillips Murrah Defendants knew of Quantum's dire financial

situation, the Phillips Murrah Defendants knowingly assisted the failing Quantum programs to

secure investments.

185.    Defendant Wolfe was aware that Quantum was insolvent for several years as

Quantum had trouble meeting its financial obligations in a timely manner, including owing large

amounts of past-due legal fees to Phillips Murrah.

186.     Defendant Phillips Murrah, through its principals and attorneys, was aware that that Quantum had several past due financial obligations to a number of entities, including owing large amounts of past-due legal fees to Phillips Murrah, and that its financial health was unstable.

187.     Despite knowing of Quantum's inability to meet its financial obligations and having the ability to disclose this information to investors, the Phillips Murrah Defendants failed to disclose this material information to investors.

188.     With knowledge of material information being withheld from investors, notably Quantum's financial difficulties, the Phillips Murrah Defendants continued assisting the Quantum Scheme in raising money from investors.

189.     The Phillips Murrah Defendants were aware that if the Quantum Scheme raised money from investors that some of that money would likely go towards past-due legal fees owed to Phillips Murrah.

### *Discovery Rule*

190.     Quantum's unlawful acts and/or omissions were, by their nature, self-concealing. By failing to disclose large amounts of pertinent information, including the lack of a trust account for investor proceeds, the Schumacher/ Mysyk lawsuit, information regarding Quantum and Quaneco's business operations, and Schumacher's excessive and fraudulent compensation, Phillips Murrah and its attorneys suppressed the dissemination of truthful information regarding their conduct and actively sought to prevent Plaintiffs and members of the Class from discovering their unlawful and deceptive acts and/or omissions.

191.     Plaintiffs could not have discovered, and in fact did not discover, the facts surrounding Mysyk and Schumacher's alleged wrongdoing until the SEC filed its Complaint on

August 21, 2015.  (*SEC v. Schumacher et al.*, Case No. 15-06388, U.S. District Court for the Central District of California, Dkt. No. 3).

192.    Plaintiffs could not have discovered, and in fact did not discover, the facts surrounding Phillips Murrah's alleged wrongdoing until the SEC filed transcripts of Mysyk and Schumacher's depositions as exhibits in connection with its Complaint.  (Dkt. No. 12).

## CLASS ACTION ALLEGATIONS

193.    Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of themselves and putative class members as defined below:

> All persons who have purchased and/or invested in Quantum
> and/or Quaneco securities since October 13, 2006.

194.    Excluded from the proposed class are: (a) Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, (b) any judge or judicial officer who may hear any aspect of this case and his or her law clerks, and (c) Defendants' legal representatives, predecessors, successors and assigns. The requirements for maintaining this action as a class action are satisfied as follows.

195.    Fed. R. Civ. P. 23(a)(1): Numerosity. The proposed class is so numerous and so geographically dispersed that the individual joinder of all absent class members is impracticable. While the exact number of absent class members is unknown to Plaintiffs at this time, it is ascertainable by appropriate discovery and Plaintiffs are informed and believe, based on the nature of trade and commerce involved, that the proposed class will include hundreds of members nationwide, thus satisfying the requirements of Rule 23(a)(1).

196.    Fed. R. Civ. P. 23(a)(2): Common Questions of Law or Fact Predominate. Common questions of law or fact exist as to all members of the proposed class and predominate

38

over any questions which affect only individual members of the proposed class. These common questions of law or fact include, but are not limited to:

a.  Whether Defendants owed Plaintiffs and the putative class members legal and/or fiduciary duties in connection with the Quantum offerings;

b.  Whether the Quantum programs' securities were offered and sold in violation of the securities rules and regulations;

c.  Whether statements or omissions in the Quantum programs' offering documents misrepresented material facts about the offerings;

d.  Whether Quantum defrauded Plaintiffs and the putative class members;

e.  Whether Quantum breached its fiduciary duties to Plaintiffs and the putative class members.

f.  Whether the Phillips Murrah Defendants committed legal and professional malpractice/negligence involving Plaintiffs and the putative class members;

g.  Whether the Phillips Murrah Defendants aided and abetted Quantum's fraud and breach of fiduciary duty.

h.  Whether Defendants' conduct violated the Oklahoma Blue Sky Laws 71 Okl. St. §1-509;

i.  Whether Defendants acted negligently and/or breached a duty of ordinary care owed to Plaintiffs and the putative class members;

j.  Whether Plaintiffs and the putative class members were damaged by Defendants' unlawful conduct;

k.  Whether Plaintiffs and the putative class members are entitled to damages, including punitive damages, and, if so, in what amount; and

l.   The measure of any damages.

197.   <u>Fed. R. Civ. P. 23(a)(3) and (4): Typicality and Adequacy</u>. Plaintiffs' claims are typical of the claims of the members of the putative class, and Plaintiffs will fairly and adequately represent the interests of the members of the class. Plaintiffs have retained counsel with substantial experience in prosecuting securities-related cases, and class actions and in complex litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and have the financial resources to do so. Neither Plaintiffs nor their counsel has any interests adverse to those of the members of the class.

198.   <u>Fed. R. Civ. P. 23(b)(1)(B)</u>: A class action is appropriate because the prosecuting of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests (non-opt out class).

199.   <u>Fed. R. Civ. P. 23(b)(2)</u>: A class action is appropriate because Defendants have acted, and/or failed to act, on grounds generally applicable to the representative Plaintiffs and the class, thereby making appropriate final injunctive relief and or declaratory relief with respect to the class.

200.   Further, a class action is an appropriate method for the fair and efficient adjudication of this controversy, because there is no special interest in the members of the class or individually controlling the prosecution of separate actions.  Absent a class action, most members of the class would likely find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. Absent class action, class members will continue to suffer harm and Defendants' misconduct will proceed without remedy. The class treatment of common questions

40

of law or fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## CAUSES OF ACTION

### Count 1 – Violation of California Corporations Code § 25504.1 (Against the Phillips Murrah Defendants)

201.    Plaintiffs repeat and re-allege each of the allegations set forth above.

202.    The Quantum Scheme investments were "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

203.    All of the Quantum Scheme securities were "offered for sale" in the state of California pursuant to California Corporations Code § 25008 because the issuers of such securities – the Quantum programs - were located in California and/or the offers for such securities originated in California, specifically from Quantum's headquarters in Irvine, California.

204.    Pursuant to California Corporations Code § 25401, "[i]t is unlawful for any person to  offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

205.    As set forth above, the Quantum Scheme securities were offered and sold directly to Plaintiffs and the members of the Class by Quantum through numerous untrue statements of material facts as well as omissions of material facts in the Quantum programs' offering documents, in violation of California Code § 25401.  Accordingly, privity exists between Plaintiffs and the

41

members of the proposed Class, and Quantum.

206.    Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25401 because they were facts a reasonable investor would consider in deciding whether to invest.

207.    Because of their roles as legal counsel for Quantum and its principals and their roles preparing the offering documents for the Quantum programs, Defendants Phillips Murrah, by way of its agents, and Wolfe knew of such misrepresentations and omissions in such offering documents. In particular, the Phillips Murrah Defendants were aware of the true facts regarding the misuse and misappropriation of funds by the Quantum principals, the undisclosed lawsuits, and the undisclosed fraud perpetrated by the Quantum principals upon earlier Quantum investors, as more fully detailed above.

208.    The Phillips Murrah Defendants are liable for misrepresentations and omissions made in connection with the Quantum securities pursuant to California Corporations Code § 25504.1, because they materially aided, with intent to deceive or defraud, in the acts or transactions constituting violations of § 25401 for the reasons set forth in the preceding paragraphs.

209.    The aid that Defendants Phillips Murrah, by way of its agents, and Wolfe provided to the perpetration of the Quantum Scheme was material, indeed essential: they helped structure the Quantum offerings and assisted Quantum organize and promote such offerings; they prepared the offering documents distributed to investors in the Quantum programs; and they helped Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

210.    Plaintiffs and the Class suffered the financial losses described herein as a result of Defendants' misconduct.

211.    Pursuant to California Corporations Code § 25501, Plaintiffs and the members of the Class are entitled to damages as set forth in the Code.

## Count 2: Violations of Ohio Blue Sky Law, O.R.C. § 1707.43 (Against the Phillips Murrah Defendants)

212.    Plaintiffs repeat and re-allege each of the allegations set forth above.

213.    The Quantum Scheme investments were "securities" within the meaning of O.R.C. § 1707.01(B).

214.    All of the Quantum Scheme securities were "offered for sale" in the state of Ohio pursuant to the Ohio Blue Sky Law because the issuers of such securities – the Quantum programs – were located in Ohio and/or the offers for such securities originated in Ohio, specifically from Quantum's headquarters in Ohio.

215.    Quantum's sales of Quantum Scheme securities to Plaintiffs and the members of the Class violated Section 1707.41 of the Ohio Revised Code, which prohibits sales of securities through false statements or omissions.  Pursuant to R.C. § 1707.41:

> any person that, by a written or printed circular, prospectus, or advertisement, offers any security for sale, or receives the profits accruing from such sale, is liable, to any person that purchased the security relying on the circular, prospectus, or advertisement, for the loss or damage sustained by the relying person by reason of the falsity of any material statement contained therein or for the omission of material facts ….

O.R.C. § 1707.41(A).

216.    As set forth above, the Quantum Scheme securities were offered and sold to Plaintiffs and the members of the Class through numerous untrue statements of material facts as well as omissions of material facts in the Quantum programs' offering documents, in violation of the Ohio Revised Code § 1707.41.

217.     Such misrepresented and omitted facts were "material" within the meaning of the Ohio Revised Code § 1707.41 because there was a substantial likelihood that a reasonable investor would have viewed such misrepresentations and omissions as having significantly altered the total mix of information available to him or her in deciding whether to invest.

218.     Defendants Phillips Murrah, by way of its agents, and Wolfe participated and aided in the sales of Quantum Scheme securities to Plaintiffs and the members of the Class, in violation of the Ohio Blue Sky Law. *See* O.R.C. §1707.43(A).

219.     Because of their roles as legal counsel for Quantum and its principals and their roles preparing the offering documents for the Quantum programs, Defendants Phillips Murrah, by way of its agents, and Wolfe knew of such misrepresentations and omissions in such offering documents. In particular, the Phillips Murrah Defendants were aware of the true facts regarding the misuse and misappropriation of funds by the Quantum principals, the undisclosed lawsuits, and the undisclosed fraud perpetrated by the Quantum principals upon earlier Quantum investors, as more fully detailed above.

220.     The Phillips Murrah Defendants are liable for misrepresentations and omissions made in connection with the Quantum securities pursuant to the Ohio Revised Code § 1707.43, because they knowingly aided and participated in sale of Quantum Scheme made in violation of the Ohio Blue Sky Law, Chapter 1707. of the Revised Code.

221.     The aid that the Phillips Murrah Defendants provided to the perpetration of the Quantum Scheme was material, indeed essential: they helped structure the Quantum offerings and assisted Quantum organize and promote such offerings; they prepared the offering documents distributed to investors in the Quantum programs; and they helped Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse. The actions of

Phillips Murrah's attorneys and Wolfe went beyond the practice of law and included conduct that was not incidental to their performance of professional obligations.

222.    Plaintiffs and the Class suffered the financial losses described herein as a result of Defendants' misconduct.

223.    Pursuant to the Ohio Revised Code § 1707.43, Plaintiffs and the members of the Class are entitled to damages as set forth in the Code.

<u>**Count 3 – Legal Malpractice/Negligence Under Oklahoma Law (Against the Phillips Murrah Defendants)**</u>

224.    Plaintiffs incorporate the above paragraphs by reference.

225.    Phillips Murrah and its attorneys, including Defendant Wolfe, served as Quantum's attorneys since approximately 1997, and provided them legal representation in connection with, among other things, the offerings described above.

226.    Phillips Murrah and its attorneys, including Defendant Wolfe, had a duty to render competent and ethical legal advice to Quantum in connection with the representation and to act as a reasonable attorney would in assisting an issuer in connection with a securities offering.

227.    Among other things, Phillips Murrah, through its attorneys O'Bannon, Vilardofsky, and Wolfe, drafted the offering documents sent to potential investors in connection with the offerings described above.

228.    Defendant Phillips Murrah, by way of its attorneys, and Defendant Wolfe knew the offering documents were to be sent to potential investors in order to induce them to invest in the offerings.  They also knew potential investors would rely on the information contained in the offering documents in deciding whether to invest.

229.     Indeed, such offering documents are prepared for the benefit of the investors, under the state and federal regulatory schemes for securities offerings, both of which make disclosure the cornerstone of such offerings.

230.     Plaintiffs and Class members are third-party beneficiaries of the attorney-client relationship between the Phillips Murrah Defendants and Quantum.

231.     Defendant Phillips Murrah, by way of its attorneys, and Defendant Wolfe acted negligently in connection with drafting the offering documents for the Quantum programs and deviated from the standard of care of a reasonable attorney representing and advising an issuer in connection with an offering of securities and in drafting offering documents.

232.     Defendant Phillips Murrah, by way of its attorneys, and Defendant Wolfe acted maliciously by having knowledge of Quantum's inability to meet its financial obligations and failing to disclose this information to investors as they were drafting the offering documents on which potential investors would rely.    They made these actions in furtherance of the Quantum Scheme and while aware that aware that if the Quantum Scheme raised money from investors that some of that money would likely go towards past-due legal fees owed to Phillips Murrah.

233.     As described above, Defendant Phillips Murrah's attorneys and Defendant Wolfe knew or should have known about the Couch Oil dispute – and consequently of the diversion and misuse of investor funds – in October 2006, and the Montana litigation in July 2009.

234.     The Phillips Murrah Defendants did not include information regarding the Couch Oil or Montana lawsuits, diversion of Quantum investor funds to Couch Oil, Schumacher's fraudulent financial practices, or Schumacher and Mysyk's lawsuit in any of the private placement memorandums, despite knowledge of these issues.

235.    Any reasonable and prudent investor would have considered this information material in deciding whether to invest in the offerings.

236.    Plaintiffs invested in the offerings in reliance on the information contained in the offering documents. They would not have invested had they been aware of these material – indeed crucial – issues.

237.    Also, Plaintiffs invested in reliance upon the integrity and legality of the offerings at issue. But for the Phillips Murrah Defendants assistance to Quantum in structuring and organizing the Quantum offerings, such offerings would not have entered the marketplace to begin with.

238.    Plaintiffs' investments ultimately lost significant value.  They would not have invested in the offerings, and thus not incurred these losses, had the Phillips Murrah Defendants made full disclosure of all material information in the private placement memorandums, and had the Phillips Murrah Defendants declined to help Quantum organize and promote its fraudulent offerings.

239.    The conduct of the Phillips Murrah Defendants proximately caused damages to Plaintiffs and Class members.

### Count 4 – Negligent Misrepresentations and/or Omissions (against the Phillips Murrah Defendants)

240.    Plaintiffs incorporate the above paragraphs by reference.

241.    Phillips Murrah and its attorneys had a legal duty to provide accurate information that was not materially misleading, and to include, rather than omit, material information from documents it drafted.

242.    As stated above, the Quantum programs' offering documents were prepared for the benefit and guidance of the Class.

243.    In the course of their business and profession, Phillips Murrah attorneys caused to be supplied to the Class false information for the guidance of the Class.  As such, Phillips Murrah is liable for its attorneys, agents and principal's negligence and omissions.

244.    Defendant Phillips Murrah, by way of its attorneys, and Defendant Wolfe acted maliciously by having knowledge of Quantum's inability to meet its financial obligations and failing to disclose this information to investors as they were drafting the offering documents on which potential investors would rely. The Phillips Murrah Defendants made these actions in furtherance of the Quantum Scheme and while aware that aware that if the Quantum Scheme raised money from investors that some of that money would likely go towards past-due legal fees owed to Phillips Murrah.

245.    These misrepresentations were both affirmative, as in the case of incorrectly informing Plaintiffs and the Class that a trust account had been established when one had not, as well as passive, in the form of omissions, as when Phillips Murrah attorneys failed to inform Plaintiffs and the class of the existence of Quantum's lawsuits, the misdirection of investor funds, the defrauding of earlier Quantum investors, the Schumacher/Mysyk lawsuit, and the fact that the offerings were not being offered in compliance with federal and state securities laws and regulations.

246.    These negligent misrepresentations and omissions proximately caused Plaintiffs and the Class to lose a significant portion of their investments.

## Count 5 – Aiding and Abetting Fraud Under the Oklahoma Common Law (against the Phillips Murrah Defendants)

247.    Plaintiffs incorporate the above paragraphs by reference.

248.    Quantum knowingly defrauded its investors, including the class members, because they sold them fraudulent securities, they induced them to invest in the Quantum programs through misrepresentations and omissions in those programs' offering documents, and they misused and misdirected the investors' money, as more fully detailed above. Quantum intended the investors, including the class members, to rely on such misrepresentations and omissions and on the integrity and lawfulness of its securities offering when invested, and the investors, including the class members, reasonably relied on these to their detriment and proximately suffered substantial losses.

249.    The Phillips Murrah Defendants knowingly aided and abetted Quantum's fraud: they helped structure the Quantum offerings and assisted Quantum organize and promote such offerings;  they prepared the offering documents distributed to investors in the Quantum programs; and they helped Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse. :

250.    As described above, the Phillips Murrah Defendants advised Quantum and its principals on structuring their securities offerings for the fraudulent Quantum programs, and helped them prepare and organize such securities offerings.

251.    Additionally, and as described above, Defendant Phillips Murrah, by way of its attorneys, and Defendant Wolfe drafted the offering documents for the fraudulent Quantum securities offerings.

252.    Quantum's offering documents contained numerous factual misstatements and omissions that potential investors would have considered material in deciding whether to invest.

253.    The Phillips Murrah Defendants' assistance went beyond the typical assistance provided by law firms and lawyers to their clients in structuring private offerings and drafting offering documents, as illustrated for instance by the Phillip Murrah attorneys' close involvement with Mysyk and Schumacher and efforts to help them reconcile, which efforts occurred in part in Defendant Phillips Murrah's own offices, and by  the Phillip Murrah attorneys' post-offering involvement with Quantum and advice to Mysyk personally as to how to handle serious instances of misconduct by his partner, Schumacher.  The Phillips Murrah attorneys also provided non-legal services to Quantum, such as helping Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

254.    Quantum sent the Quantum programs' offering documents to potential investors in order to induce them to invest in the offerings, and knew they would rely on the information contained in such offering documents, and upon the integrity and legality of those securities offerings, in deciding whether to invest.

255.    Plaintiffs did not know, and had no reason to know, of the numerous material factual misstatements and omissions in the private placement memorandums, of the fact that the Quantum offerings were a fraud, and of the misuse and diversion of funds by the Quantum principals.

256.    Plaintiffs received the private placement memorandums and reasonably relied on the information contained therein, and upon the integrity and legality of the Quantum securities offerings, in deciding whether to invest.

257.    In fact, the Rich County Overriding Royalty Offering, Quantum Energy Phoenix Program, Overthrust Overriding Royalty Offering, 2012 Overriding Royalty and Development

Program, and Niabora Leasing and Development Program private placement memorandums expressly state:

> EXCEPT AS STATED UNDER "ADDITIONAL INFORMATION," NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM OR THE ACCOMPANYING OFFERING PROPERTIES SCHEDULE AND, IF GIVEN OR MADE, SUCH INFORMATION AND REPRESENTATIONS MUST NOT BE RELIED ON.

258. Similarly, the Crawford Thrust Offering private placement memorandum expressly states:

> EXCEPT AS STATED UNDER "ADDITIONAL INFORMATION," NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM OR THE ACCOMPANYING EXHIBITS AND, IF GIVEN OR MADE, SUCH INFORMATION AND REPRESENTATIONS MUST NOT BE RELIED ON.

259. Similarly, the Quaneco, LLC Preferred B Units Offering and the Quaneco, LLC Preferred D Units Offering private placement memorandums expressly state:

> EXCEPT AS STATED UNDER "ADDITIONAL INFORMATION" IN THE PRIVATE PLACEMENT MEMORANDUM, NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE PREFERRED [B/D] INTERESTS DESCRIBED HEREIN, AND, IF GIVEN OR MADE SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE MANAGERS.

260. And, the Quantum Energy 2011 Drilling and Production Program private placement memorandum expressly states:

> EXCEPT AS STATED UNDER "ADDITIONAL INFORMATION," NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS

51

OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS AND, IF GIVEN OR MADE, SUCH INFORMATION AND REPRESENTATIONS MUST NOT BE RELIED UPON

261.     Indeed, the Quantum programs' offering documents were the *only* representations upon which the investors were entitled to rely.

262.     Plaintiffs lost a significant portion of their investments in the Quantum and Quaneco offerings as a result of their reliance.

263.     The Phillips Murrah Defendants knew that the Quantum programs were fraudulent and intended to, and defrauded, their investors, because they knew that the Quantum principals were misusing and divesting investor funds to Couch Oil and their personal use; they knew that Quantum programs offering documents contained material misrepresentations and omissions, as more fully detailed above, and they knew that the Quantum principals had defrauded investors in previous Quantum programs.

264.     Among others, as described above, Phillips Murrah through it attorneys, agents and principals knew about the Couch Oil dispute in October 2006 and the Montana litigation in July 2009.

265.     Additionally, Phillips Murrah through it attorneys, agents and principals was notified in September 2010 that Schumacher was (i) taking compensation and bonuses in excess of what was disclosed to investors, (ii) making personal loans to himself out of funds raised from investors, (iii) commingling funds that were to be segregated in trust accounts, and (iv) paying operating expenses in excess of what was disclosed to investors.

266.     Phillips Murrah through it attorneys, agents and principals also knew that Mysyk and Schumacher were engaged in a personal dispute in 2010 that led to Schumacher filing a lawsuit against Mysyk.

267.     Phillips Murrah through it attorneys, agents and principals drafted the private placement memorandums at issue.  They knew this information was material and that investors would have considered the information highly relevant in deciding to invest.

268.     Nevertheless, they did not disclose this information in the private placement memorandums, thus giving substantial assistance to Quantum Energy and Quaneco in defrauding the investors.

269.     Accordingly, Phillips Murrah through its attorneys, agents and principals and Defendant Wolfe aided and abetted the fraud of Quantum, Quaneco, Mysyk, and Schumacher.

270.     Phillips Murrah and its attorneys are liable for Plaintiffs' losses resulting from the fraud of Quantum, Quaneco, Mysyk and Schumacher.

## Count 6: Aiding and Abetting Breach of Fiduciary Duty Under Oklahoma Common Law (against the Phillips Murrah Defendants)

271.     Plaintiffs incorporate the above paragraphs by reference.

272.     As described above, Quantum breached its fiduciary duties of due care, loyalty, disclosure of material information, candor and good faith.

273.     The Phillips Murrah Defendants knew Quantum owed fiduciary duties to Plaintiffs and the Class members and breached such duties, because they knew the Quantum programs were fraudulent and that Quantum and its related entities were engaged in various acts of misconduct. Among other things, they knew that Quantum was misusing and diverting investor funds for unauthorized purposes; that Quantum and its affiliated entities were involved in undisclosed

litigation; and that Schumacher was engaged in fraudulent financial activities and that he and Mysyk were embroiled in litigation against each other.

274. The Phillips Murrah Defendants substantially assisted Quantum in its breaches of its fiduciary duties by structuring the securities offerings they knew were intended, and were going, to defraud the investors, by advising Quantum on organizing and promoting those offerings, by drafting offering documents that contained material misrepresentations and omissions and by helping Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

275. The Phillips Murrah Defendants' assistance went beyond the typical assistance provided by law firms and lawyers to their clients in structuring private offerings and drafting offering documents, as illustrated for instance by O'Bannon's close involvement with Mysyk and Schumacher and efforts to help them reconcile, which efforts occurred in part in Defendant Phillips Murrah's own offices, and by O'Bannon's post-offering involvement with Quantum and advice to Mysyk personally as to how to handle serious instances of misconduct by his partner, Schumacher. The Phillips Murrah attorneys also provided non-legal services to Quantum, such as helping Quantum seek desperately-needed financing to continue to perpetrate its Ponzi scheme and avoid collapse.

276. As a direct and proximate result of the Phillips Murrah Defendants' conduct, Plaintiffs lost a substantial portion of their investments in the Quantum programs.

Phillips Murrah and its attorneys are liable for Plaintiffs' losses resulting from Quantum's breaches of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

1.     Certifying this action as a class action pursuant to Fed. R. Civ. P. 23(b);

2.     Certifying Plaintiffs as class representatives and appointing the undersigned counsel as class counsel;

3.     Enter judgment in favor of Plaintiffs and members of the Class and against Defendants;

4.     Find that Defendants are liable to the Plaintiffs as a result of their unlawful and deceptive acts and omissions detailed above;

5.     Award Plaintiffs compensatory damages;

6.     Award Plaintiffs consequential and incidental damages;

7.     Award Plaintiffs pre-judgment and post-judgment interest as provided by law;

8.     Award Plaintiffs punitive damages as provided by law;

9.     Impose a constructive trust and equitable lien in favor of Plaintiffs against all money paid to and/or wrongfully withheld by Defendants;

10.     Award Plaintiffs attorneys' fees and costs as provided by law; and

11.     Award Plaintiffs such other and further relief as may be just and proper.

## JURY DEMAND

A trial by jury is hereby demanded on all issues so triable.


Date:  October 6, 2017                                      Respectfully submitted,


                                                           /s/ *James P. Booker*

55

James P. Booker (OBN 0090803)
Alan L. Rosca (OBN 0084100)
**PEIFFER, ROSCA, WOLF,**
**ABDULLAH, CARR & KANE,**
**A Professional Law Corporation**
1422 Euclid Avenue
Suite 1610
Cleveland, OH 44115
Telephone: (216) 589-9280
Facsimile: (888)411-0038
E-mail: jbooker@prwlegal.com
E-mail: arosca@prwlegal.com


J. Barton Goplerud (*pro hac vice to be submitted*)
Brian Marty (*pro hac vice to be submitted*)
**SHINDLER,  ANDERSON,**
**GOPLERUD AND WEESE PC**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
E-mail: goplerud@sagwlaw.com
E-mail: marty@sagwlaw.com